Good morning, Your Honor. Good morning. May it please the Court, my name is David Anthony. I'm appearing as amicus curiae with the Federal Public Defender's Office, and we'd like to save three minutes for rebuttal. This Court has certified a question of whether its decisions in Pope v. Sandoval and Chambers v. McDaniel are still good law in light of the Nevada Supreme Court's decision in Nika v. State. To answer that question, we need to distinguish between two classes of habeas petitioners. First, there are the habeas petitioners like Mr. Polk, whose convictions were final on or after February 28th of 2000. That date was significant because that was the date the Nevada Supreme Court decided the Byford case. As to that class of petitioners, this Court's decision in Polk is still good law because the Nika decision says that Polk must be applied to that class of petitioners. So I'm going to set that issue aside. The other issue is whether the class of petitioners whose convictions were final before February 28th of 2000 are still good law under Chambers and also for Mr. Winfrey, whose conviction was final before that time. The answer to that question is, yes, Polk is still good law as applied to that class of petitioners, because the Nevada Supreme Court's decision in Nika simply does not address the constitutional problem with the jury instruction which purported to define first-degree murder. The question we need to ask ourselves is, at the time Mr. Winfrey's conviction was final, was there a distinction between first- and second-degree murder? And if there was, what was the distinction? Now, the Nika court says that there was always a difference between first-degree murder and second-degree murder. However, in the Byford case, the court also said that at the time of Mr. Winfrey's conviction, the court had, quote, blurred the distinction between first- and second-degree murder to a complete erasure. The problem with the Nika opinion is it never applies the observations in Byford to the jury instruction. That's the reason why Nika is, doesn't address the problem that was addressed in Polk. Now, the Nevada Supreme Court tries to get out of that conundrum by saying that in pre-Byford cases, the elements of deliberation and premeditation were just synonyms that meant the same thing. Well, assuming that that's true, we should be able to find the substantive content of the term deliberation in these jury instructions. And the point is that that content is missing from the jury instructions. It's been deleted and it's been removed from the jury's consideration. The Nevada Supreme Court characterizes the element of first-degree murder as actual reflection by a defendant on an intent to kill while in a cool state of mind. The Nevada Supreme Court also talks about this element as a pre-existing reflection that's not formed under a sudden impulse, under a rash impulse. So the question before this Court is very direct. Where are those elements in the jury instruction? The answer is that they've been removed from the jury's consideration. Those are the elements that distinguish first-degree murder from second-degree murder. It doesn't matter whether we want to call those elements premeditation, whether we want to call them deliberation, or we can call them whatever we want. What was this jury instruction? The jury was instructed in terms of what's been referred to as the Kaslan instruction. And Kaslan says that premeditation is a design, a determination to kill that can be formed instantaneously, instantaneously like successive thoughts of the mind. So the jury instruction defines first-degree murder in terms of the time it takes to premeditate, as opposed to talking about what really distinguishes first- and second-degree murder. By defining the first-degree murder in terms of the time it takes to form the mental state, the jury instruction effectively removes anything that is premeditated. And that's really the extent of the instruction, is it says that premeditation is a design and a determination to kill formed as instantaneously as successive thoughts of the mind. Now, again, this Court has referred to that element as a second thought. And I'm not saying that any magic language is required for the jury instruction, but what I am saying is to distinguish between first- and second-degree murder, there has to be something in the instruction that tells the jury that it can't just be an intent to kill. It has to be something more to be first-degree murder. Now, Polk pretty much lays all of this out in chambers pretty clearly. And time is running, and I think there are other, there are some other instances where the jury instruction is  And I think that's one of the issues that I'd like one of you to address, relating to procedural default, and even assuming, get over procedural default and assuming there was error, whether it was harmless under Brecht on either ground. Your Honor, I was hoping to reserve the case-specific analysis under Brecht for counsel, for Mr. Winfrey to discuss the facts of the case. The only thing I would say with respect to procedural default is that it's not a case-specific analysis. It seems very clear from the briefing that this issue was clearly raised and federalized in a third-state post-conviction petition, and also decided on the merits. Well, a third-state post-conviction was not before the district court, correct? Yeah, I don't think we can consider that, can we? Well, there is controlling authority on that issue. There's the Schwartz-Miller case, and there's also the Sharp v. Buchanan case, where the high court says that the exhaustion doctrine is only a timing issue that's not a case-specific analysis. It's done out of comedy and federalism to the state courts. If that has changed, the high court has said that it's not only permissible, but it's required for this court to consider the issue in light of its new procedural posture, which is that claim is presently exhausted before the court. It has been exhausted on the merits from the third-state petition. There's no dispute that it was exhausted on the merits in that proceeding. It was never addressed. This issue, though, the third petition was not presented to the district court. That's correct, Your Honor. And I believe that we've requested the court take judicial notice of that proceeding in light of the fact that it is now exhausted. Well, if we can't take notice of it, is there any other way that we could find that there was not procedural default here? I think there is, Your Honor. The court could also easily find that it was exhausted on the merits on direct appeal when Mr. Winfrey joined in the briefing of Mr. Green. If you look at the opening brief and the answering brief, it's clearly postured in terms of a constitutional violation based on the removal of the element of deliberation from the first-degree murder statute. And if you look at the State's answering brief, they cite to Cut v. Naughton, which is the quintessential authority in Federal habeas, that you analyze jury instructions as a whole. And if you look at the Nevada Supreme Court's opinion afterwards, it appears very clear that they were addressing a Federal issue in their decision in direct appeal. And if there are no more questions, I'll reserve the remaining time here for Ms. Cartlidge for Mr. Winfrey. Thank you. Good morning, Your Honors. My name is Glenn Cartlidge, and I represent Mr. Winfrey. I will speak to the harmless error in this. I want to tell the court, first of all, that this is a man who didn't kill or shoot either of these victims. He didn't speak of the murders until after they happened. But because he tried to shoot one. What he tried to do, Your Honor, was he had his gun beside him, or he had the gun that was in the car. He took it up, and he fired it. And he shot toward the ground. You have to understand that this was a very – I want to go through the facts of this, because I think the facts are crucial to the harmless error finding, and as well, I think that it's crucial to the issue of actual innocence or to the issue of substantial evidence. He – How do we know he shot it to the ground? That was a testimony by Heather Barker. She said that he shot toward the people. However, this was a very small area. When he pulled the car up the second time, he was about 20 feet away. One of the things that I want the court to understand, too, is that all of this occurred in two minutes. By the time they reached the – Tell me again, what's the testimony as to how he shot? Her testimony varied. Her testimony was that he shot toward the ground and toward the people, and then she also testified that she could not see the gun. So that was her testimony. So it's pretty ambiguous. Yes, sir. And he testified that he took the gun out because he was afraid of Green and that Green was losing it, essentially, and that he shot – he pulled the – I think it was a semi-automatic, so he pulled the chamber back and shot off to his left. That was his testimony. Did he testify why he went out there with a gun? Yes, he did. He said he went out there because Mr. Green was – and this makes sense. He said, I didn't know what frame of mind Green was in. He was losing it, obviously. And what I want the court to understand also is that – I don't get the – how does that connect with his bringing a gun? Bring a gun to the scene, Your Honor? Yeah, I mean, how does Winfrey – why does Winfrey bring a gun? Because he thinks Green is crazy. Well, they went out to a known shooting range. The detective and Philip Sousa testified this was a shooting range. They drive up, they see a Volkswagen in the distance, and Heather Barker said she thought there was someone lying beside it. Within 45 seconds, Green has exited the car, holding the Mini-14 in his hand, and shot the victim. Within 45 seconds that happened. Then she turns to Winfrey and says, what was he doing? Why was he doing that? He just shoots somebody? Winfrey then pulls the car up 20 feet, gets out of the car with a gun, and shoots it off to the left. And to me it makes sense, because I don't think I would have gotten out there with that maniac at this point. Within 30 seconds, Green shoots the second victim. Well, if he'd shot Green, it would have made some sense. Your Honor, it would have, but that's one of the points that I'd like to make that I think the district court erred in. And when it made its findings, it found three times it mentioned that Winfrey did nothing to prevent the murder. Three different times in a page it said this. And I see that I'm running out of time. Just go ahead and make your answer. He wants three minutes for a rebuttal. Yes, sir. And I don't think that's, it's not only irrelevant, but it's not illegal that Winfrey didn't do anything. Barker didn't do anything either. She sat there in the car. They both sat there in the car. It was extremely dark. It all happened very fast. And I want to also emphasize that nothing was said between these two individuals, not on the way out there, not at the mountain. It was only after the fact that there were some ambiguous things said. But I don't know how the jury found, except with this faulty jury instruction and with the faulty aiding and abetting instruction, how they found him guilty when no conversation occurred between these two. And I think there were inferences. If you have no further questions, I'll reserve the rest for Mr. Anthony. Thank you. May police court. My name is Heather Proctor, deputy attorney with the state of Nevada, and I have the honor of representing the respondents in this matter. First, as to the amicus, I would just like to respectfully submit that as a friend of the court, the amicus brief and arguments should not be used as a substitute for Winfrey's arguments in this case and should be accepted only as a substitute for the amicus brief. It should be accepted only as what they are as a friend of the court arguments. As to what has been argued as to the harmlessness of the Casaland instruction that was presented in this case, we're missing some key evidence in this matter. First, Heather Barker in this case testified not only did the petitioner Winfrey point his gun at Deborah Michelle Ferris, he attempted to shoot Deborah Michelle Ferris, and the prosecution on rebuttal asked, is there any doubt in your mind that he attempted to shoot her? And she said, no, there's no doubt in my mind. In addition, there's the testimony of Philip Sousa that after the murder, Mr. Winfrey not only told him of inaccuracies regarding the deaths as they were appearing on the news, but also that Mr. Green shot Mr. Payton and that Winfrey was supposed to shoot Deborah Michelle Ferris. He was unable to because his gun jammed, Green therefore shot her himself, and that Winfrey himself was actually upset that he was not able to shoot her and he would like to do it again. Let me ask, what was, so this whole hate is proceeding turns on the validity of the instructions, both for aiding and abetting and for first-degree murder. Intent was critical here, correct? Correct, Your Honor. For both, for purposes of aiding and abetting. Yes, Your Honor. And for, I guess, for Green, a first-degree murder charge. So how does all this, so let's assume the jury properly instructed about intent. Your argument is that these facts that you're presenting are not sufficient, that the facts you just pointed out would lead, would not lead a reasonable jury to conclude that he didn't have the specific intent that was required? My argument is that if the instructions were not harmless. No. Let's assume that the jury was properly instructed. That they were properly instructed, then most definitely there was sufficient intent demonstrated from his actions with getting out, not only pulling his car up but getting closer to the victims, getting out of the vehicle with a loaded gun, walking up to the victims, attempting to shoot Ms. Ferris and the only reason he didn't shoot her was because his gun jammed. And he confessed that later on to Sousa that I wanted to shoot her, that was the agreement, that I was supposed to shoot her and my gun jammed. And that was the agreement. Well, that was he, but he told Sousa, I was supposed to shoot her. Now, they arrived there and at the time they arrived there, they didn't know that there were people going to be lying on the tarmac. Did they then, before they got out of the car, say, Green says I'm going to take one and you take the other? Your Honor, there was testimony by Ms. Barker that the two men were discussing something, and Green said, I'm going to take one and you take the other. As they were driving, she could not hear what they were discussing because the radio was too loud. But there's no real evidence that one was supposed to shoot one and that Winfrey was supposed to shoot the other. I didn't find that anywhere. Where would you point me? I would point you to the statements of Mr. Winfrey to Philip Sousa as to the statement that Green was supposed to shoot one and he was supposed to shoot the other. And just this Where did we see that testimony? Your Honor, I do cite that in my answering brief. I would be able to give you an answer. But it is in your answering brief, is it? I believe so, yes. Yes or no? Yes. Okay. And we have the circumstances surrounding the situation. Again, Mr. Winfrey was not the shooter. That is not disputed. Mr. Green shot Peyton and Ferris. But he was an aider and abetter in this situation. He was the driver of the car. He chose where to drive out into the desert. Well, that's fine. I understand all that. But I didn't understand that they had an agreement that Winfrey was supposed to shoot Ferris. That was Philip Sousa's testimony when he was recalled to the stand after Winfrey's testimony. What do we make of this conspiracy conviction? Your Honor. How does conspiracy play into all of this? Your Honor, the conspiracy, pursuant to jury instruction four, the conspiracy instruction specifically instructed the jury that in order to do this, in order to find conspiracy, the jury had to find that the defendant had the intent to commit or aid in the commission of the specific crime agreed to. And the jury found that existed. The jury found that pursuant to the conspiracy, that Winfrey had the specific intent not only to commit conspiracy in this crime, but to commit the murders of these two crimes, to aid in the commission of these crimes. So does it make any difference, all this dispute about the aiding and abetting instruction and the validity of the first-degree murder instruction? Your Honor, in our argument, there was specific intent. Then the jury found that he had the intent to commit these crimes under that aiding and abetting, under that conspiracy. Well, I'm just talking about a conspiracy for a moment. I mean, is everything, are these convictions all proper with, simply with, on the basis of the conspiracy conviction? They're not proper only on the conspiracy conviction, but they're not harmless based upon the conspiracy conviction. I see. Do you agree that the aiding and abetting instruction was incorrect? No, Your Honor. I believe that based on the jury instructions when read as a whole, it was incorrect. I believe that based on the jury instructions when read as a whole, particularly taking into account jury instruction 10, that the jury was given more than the mere probable circumstances. Well, under Nevada, under, I forget the case, Sharma, is it Sharma, I think it is? Correct, Your Honor. Under Sharma, that aiding and abetting instruction doesn't match what was required by the court in Sharma, and in Sharma they said that the new, that their clarification of what intent was required for aiding and abetting was nothing more than a clarification. If you look at the instructions here on aiding and abetting and you look at Sharma, they don't add up. Well, the Sharma instruction did not have the jury instruction 10, which said that you need to find beyond a reasonable doubt that it was more than a mere spectator. That was the natural and probable consequences doctrine that was overruled in Sharma. Why does 10 cure this? All it says, basically, is that you have to find these things beyond a reasonable doubt. But what do you have to find? That he was a knowing spectator, that he knew what was going on in the situation. No, we're talking about just what the instructions are telling us. Now, 10 says you have to find it beyond a reasonable doubt. The other doesn't say that you have to find intent. Your Honor, with jury instruction 10, jury instruction 10 says you cannot be a mere participant. You have to find beyond a reasonable doubt that you're a knowing spectator, or excuse me, a knowing participant. So that takes it beyond what the case showed in Sharma of the mere presence, and it adds that additional intent element. When we go and include the conspiracy argument, even assuming that there was an instructional error under Sharma, that conspiracy conviction demonstrates there was no harmless error regarding the aiding and abetting jury instructions. So address the issues of procedural default, if you will, for just a moment. Yes, Your Honor. Very briefly, regarding the procedural default, the Federal District Court in this matter found that the procedural defaults that were applied in this case were incorrect because they were not adequate. First, as to the aiding and abetting jury instruction, that was not raised on direct appeal. The only issue that was raised on direct appeal as to jury instructions was by codefendant Green and the premeditation jury instruction. He did not challenge the aiding and abetting jury instructions. In fact, he was not convicted of aiding and abetting. He was convicted of actually committing the murders. So there's no reason he would have challenged the aiding and abetting jury instructions. That claim was not exhausted on direct appeal.  Right. In the Second State Habeas Petition, the Nevada Supreme Court found that petition procedurally barred pursuant to Nevada Revised Statute 34.726 as untimely and 34.800 as laches. It found the entire petition procedurally barred. That is why this case is distinguishable from Coroner Valerio and Bean. In those cases they went on to say and furthermore, I think they used the word furthermore, it's a successive petition or some of the claims were successful. Correct, Your Honor. What's that all about? The 34.810 application is very similar to the application that appeared in Valerio and Coroner. However, my point is this Court can still find that the claims are procedurally defaulted on these other two. But how can they both be successful and untimely? If they're one, they're not the other. Your Honor, my argument is that the court in the Federal District Court found that the claims, the procedural bars as applied here were improper based on Valerio and Coroner because the Nevada Supreme Court failed to state which claims the procedural bars applied to. That's not the case with the timeliness and the laches bars. Those apply to the entire petition. And therefore, every claim raised in that petition, the court, the Nevada Supreme Court clearly stated every single one of those bars, excuse me. But then they also said that some of them were successful, but you can't reconcile those statements. They're inconsistent. As to the 34.810, the... Successive. Is that successive? That's successive. Absolutely. I'm not quite as familiar with the Nevada code as you are. I apologize, Your Honor. Yes. The successive petition argument is similar to what was in Valerio and Bean. We recognize that. However, the question is, was the application of the procedural bars adequate? The Nevada Supreme Court clearly applied them to every single claim raised. The Nevada Supreme Court was not required to state this claim is timely, this claim is barred by laches. That's not the way state procedural bars apply. They apply to the entire petition. They don't apply to individual claims. Counsel, I've kind of made myself a little timeline in this case. And the only period where it seems that there was any lengthy delay at all was between when the Nevada Supreme Court affirmed the conviction and the first state post-petition was filed. Now, that gap was two years and four months. Otherwise, none of the gaps were more than four months. One was eight months. So I don't unless that would constitute laches as to the whole thing, I don't see where we're going. Your Honor, under State law, the bar of laches applies when there's a five-year gap between the decision on direct appeal and the filing of the new petition. But, you know, once he got started with his post-conviction procedures, he was able to go from two years, it was four months, to the next one, four months, one month. I just don't see that it's a case where there was any undue delay, except possibly between the conviction affirmed by the Nevada Supreme Court on direct appeal and the filing of the first petition for post-judgment relief. And again, Your Honor, under the Nevada law, the way the laches provision reads, you don't take into consideration intervening State habeas petitions. You take into consideration the lag time between the denial of direct appeal and the filing of the current petition. And that is not a, it is a rebuttable presumption as to laches. The State must argue laches, but it is a rebuttable presumption that the petitioner can overcome if he can rebut the presumption that it has not been a five-year gap, that there has been some basis to overcome the presumption of laches. So it's not the gap between the filing of the intervening State habeas that we're looking at. We're looking at the time period between the direct appeal and the filing of the second State habeas petition. Turning to the premeditation instruction that was raised on direct appeal by Green, why wasn't that sufficient to raise, to present the constitutional claim here? Your Honor, it is our position that the casual instruction was a proper statement of the law at the time that, of Winfrey's conviction in 1995. At the law at the time, the premeditation instruction did read that it included premeditation, deliberation, and willfulness. The statute provides that you need premeditation, deliberation, and willfulness, but didn't distinguish between the three. That really wasn't my question. My question was whether it was properly presented to the Nevada Supreme Court. The constitutional claim that we're dealing with here in the petition. Absolutely. And my position is, yes. In as to this. Yes, what? Yes, it was presented? That the Nevada Supreme Court properly addressed it. That the decision in Bifer. So there's no procedural default, then, with respect to that claim? Oh, excuse me. As to the premeditation jury instruction, the premeditation jury instruction with the definition of deliberation and the distinction between first and second degree murder, we conceded in our motion to dismiss that that was raised on direct appeal and that was properly before the Nevada Supreme Court. Okay. However, the argument regarding Bifer and whether that applies retroactively and whether the new definitions in Bifer apply retroactively was not raised until the second state habeas petition. And therefore, it would be subject to the procedural bars contained in that second state habeas petition. Now, that's a pretty fine distinction. Well, Your Honor, the And doesn't that raise the problem that Judge Noonan was trying to address with you? Your Honor, it is our position that they are separate claims. The second claim regarding Bifer is the whole claim regarding the Bunkley decision and whether a subsequent decision should be applied retroactively, whether that's an issue of state law versus federal law, and whether the change in the law should be applied retroactively to an existing case. And that's where we get into a concern with the Polk decision in pre-Bifer cases is even if you consider the case under Sandstrom, Polk relied heavily on the determinations of Bifer, the determinations regarding the Casaline instruction and the determinations regarding the definitions in Bifer. However, in Sandstrom, you can only consider the jury instructions as they were actually read to the jury. Bunkley says if the state law determines that it is not retroactive, it's a change in the law, that law cannot be applied retroactively. It's a question of state law. So you have Sandstrom saying we can only look at the law as it was presented to the jury and the law that existed at the time. We don't look at the history of that law, either before or after. But pursuant to Polk, we have to apply retroactively a case that was decided after Polk, contrary to Bunkley that says, no, under Bunkley, the Nevada Supreme Court said it doesn't apply retroactively. It should not apply to this prior case. Okay. Sorry, I know that's kind of confusing. We'll work through it. Don't worry. If there are no further questions, in conclusion, we would ask that to the extent as I've argued today that you find the claims procedurally barred, save for and accept the premeditation during instruction in and of itself. To the extent the court finds that they are not procedurally barred, that the court find instructional error that any such error should be harmless and that the Nevada Supreme Court's decision was not contrary to unreasonable application clearly established by our law. Thank you. Thank you. Very briefly, I wanted to pick up with counsel's concession about exhaustion. I think that's a key point that we need to decide here. From what I hear from the Attorney General, it appears that there is a proper concession here that on direct appeal, a Federal claim was raised. Now, the argument that's being made is that they didn't raise a Biford claim. But Biford is a State law claim. We're here to exhaust Federal claims. We're not here to exhaust claims about State law. So the fact that Biford didn't exist doesn't matter. The question is, was there a Federal claim presented on direct appeal? Let me ask you this. Suppose that the aiding and abetting instruction claim is procedurally defaulted. What's the relationship? What happens then with respect to the premeditation claim and the defaulted, assume that it's defaulted, aiding and abetting claim? How does it all work together? Well, it certainly works together in the sense that we're talking about one overarching issue here, and that's the issue of intent. And the issue is the intent of Mr. Winfrey. Now, with the concession that we have on premeditation, it still is wrapped up in this question of what is the intent that we require of Mr. Winfrey if he's going to be liable for first-degree murder. Now, the State saying here that, you know, Bunkley says the State can change its laws, but that's not really the point. We're not here to talk about whether the State changes its laws. We're just looking at the jury instructions. If you look at Sandstrom, if you look at Francis v. Franklin, if you look at Mulaney, in every single case, the State court tried to say, well, our law meant one thing. But the Federal courts and the high courts say, but we're looking at the jury instruction to see whether it removes an element of the offense. I don't know if I answered the court's question about intent. How does the premeditation instruction actually apply to Winfrey? That's a very good question. I guess that's what I was trying to ask before. I just didn't quite get it. Arguably, if you look at the prosecutor's closing argument, it could be an argument of pure imputed intent, that if he is found to be aiding and abetting Green, that means that if Green had the relevant intent, that it transfers to Winfrey. That's the problem with the aiding and abetting instruction. In Sharma, the case the court mentioned is very clear saying that the jury instructions must make that distinction and require that the aider and abetter have that specific intent. I don't think that there's been really any argument here from the other side that the instructions were proper, except for this reference to this mere participant instruction. But that doesn't solve the problem that we have with the bad aiding and abetting instruction. It just simply doesn't address that issue. How does the conspiracy instruction or conviction overlay any of this? I mean, how does that relate to all these other claims? Well, it certainly fits into this bag of intent. The question still becomes, could they have found a conspiracy using a bad theory? Could they have found a conspiracy because while Mr. Winfrey was present at the trial, they found he was an aider and abetter. They could have transferred that to conspiracy as well. I admit that's a big jumble. It's a big jumble of intent. It's hard to sort out. But what we can say is that the premeditation instruction is bad no matter what. We can also say that the aiding and abetting instruction was improper under Sharma, and the mere participant instruction simply doesn't solve the constitutional problem with that instruction. The one thing that Ms. Cartlidge wanted me to add is that this argument about a prior agreement goes to this issue about a conspiracy. If the court looks at the briefing, if the court looks at the record closely, there isn't evidence of any sort of an agreement here. At least from what I can tell from the briefing, there's not evidence of an agreement. Well, there's a conviction, though, of conspiracy to commit murder. Well, and there's also an uncertified claim before the court about whether there's substantial evidence to support that, the conviction itself. The prior question is whether the jury instructions are valid or invalid, because that, even if there was a weakness, even if there was tension between the evidence for and against the intent elements, if the instructions are bad under Brett, there is still harmful error in this case. Because reviewing the record as a whole, we can't determine that the error was harmless. You're beginning to run over your time. I'll let you go over two minutes. Thank you, Your Honor. Okay. Thank you, counsel. We appreciate your arguments. There are a lot of issues here.      Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Fletcher, Noonan, Paez